So it looks like we have a number of lawyers here representing the objector appellants. And it's been communicated to me that each would like five minutes. Is that correct? Where am I looking? And so you want to also reserve within your five minutes rebuttal time? Can somebody come here, whoever's going to start, please come forward? I'm just questioning whether the best use of your time, but it's up to you. Well, the best use of my time would be to have more time, Your Honor. Well, that's right. And you can take all the 20 minutes, and that's what sometimes, you know, people work out different arrangements. But how you want to reserve within your five minutes some time for rebuttal? One minute, Your Honor. Is that true for everybody? I can't speak for everybody. Well, I want to know up front right now, because I'm just trying to figure out how much of a revolving door we're going to have here today. No, Your Honor, no rebuttal time for me. John Pence. Okay. If we're ready to proceed, then you may go forward. Thank you, Your Honor. May it please the Court, my name is Albert Bachrach, along with Paul Rothstein here at counsel table. We need to start the clock. We represent Roy Geiserbach through his guardian, Mr. Darbyshire. We believe that the issue remaining after the Ambach decision in Hyundai can be found on page 41 of the plaintiff appellant's brief, where they say that the arbitration clause here is materially identical across the class. And that's not true, because there's a subclass of persons who did not have any Geiserbach, who are class members, but clearly couldn't be bound by the arbitration agreement. It appears from the limited discovery that was done in this matter that there was no discovery with regard to the issue of the number of people, or the percentage of the millions of people affected, who had no contractual relationship with Wells Fargo, and therefore would not be bound by any arbitration agreement. I think that there's no argument that arbitration is a contractual remedy, and if there's no contract, there's no arbitration. So you're wanting us to look at Masa and Henry Hyundai, is that correct? Well, when the court, Ambach, decided, yes, I suppose a direct answer would be correct. Okay, so the question, I just wanted to make sure I understood, because that's what I thought you were, the objectors were arguing in the briefs, but those only involve state causes of action, so I'm trying to figure out how does that help you? Well, because what we're really looking at here is whether the obligations under 23E2 with regard to fairness, reasonableness, and adequacy are met by a settlement which doesn't deal with the subclass of people whose remedies are not restricted by the arbitration agreement that the district court found would prevent the entire class from moving forward. But here there was a federal claim. That's correct. So why doesn't that make a difference? It doesn't make a difference because the arbitration defense is not available against people who have no contractual relationship with Wells Fargo. So looking at the cases as it develops, cases filed among the issues for the district court is the issue of arbitration. The district court finds that the issue of arbitration is not an issue that can even be dealt with by the district court, and an under the arbitration language. It goes on appeal to this court. While it's on appeal in this court, the mediator for the circuit contacts the parties, and then Wells Fargo's attorneys do a phenomenally great job. They do an analysis that shows that although there may be a small percentage of chance that the plaintiff's appellants will win in the Ninth Circuit, there's still some chance that the Wells Fargo defendant appellees lose on that issue. Did you present a choice of law analysis to the district court? I did not. Do you want to reserve the balance of your time? I do. Okay. May it please the Court, Cameron Christensen on behalf of Objector Appellant Scott Johnston. In our brief, we set forth over ten reasons why class certification should be precluded, and each of these individually would be sufficient for this court to overrule and remand this class certification. However, when we look at the totality of circumstances surrounding both the negotiations, settlement agreements, and certifications of this class, it becomes clear that this class certification must be remanded. First, the district court failed to take into consideration major case developments. One of those was the arbitration agreement, which is this arbitration agreement between the parties and Wells Fargo was a foundational principle and a key determination in the settlement, and that was mentioned in many of the briefs. This arbitration agreement was waived by the district court on October 3, 2017, where before Congress he said, Wells Fargo has not, we are not, and we will not use forced arbitration for any of these fraudulent accounts. And this was a, this was not taken into consideration or applied to the settlement. Further, in involved in, we saw that Wells Fargo waived that arbitration provision. Second, the arbitration, the district court didn't provide a lot of analysis of how this arbitration agreement can be applied to fraudulently opened accounts and to those class members, as counsel has mentioned, who are minors or haven't agreed to that arbitration agreement as it applies to fraudulent accounts. The second major case development that wasn't taken into consideration is the amount of people involved in the settlement and the dilution of the settlement per class member wasn't taken into consideration. In March 2017, we saw 1.5 million accounts, and the amount was 110 million, or about, if it's spread equally, $73 per fraudulent account. Ten days later, the district court, or the PricewaterhouseCoopers report came out, and it was now 2.1 million accounts for the 142 million, or diluted to $67 an account. And finally, August 31, 2017, they added another 1.4 million without any, without any increase, which diluted it down to 60, about $40 per account. This really underscores another issue that we have, is the need for subclasses and separate representation. And admittedly, opposing the parties have done a clever way of opening a back-end, a blank check from Wells Fargo, but during this process, all of these subclasses needed to be represented, and they all needed to make sure that somebody was fighting to prevent them from having their share diluted from newcomers or from the old people. And I would like to reserve the balance of my time. Okay, thank you. Good morning, Robert Clore for the appellant, Chad Farmer. Mr. Pence and I are going to discuss the $21 million attorney of the award, and I'd like to focus specifically on methodology. Granted, a district court has a discretion to choose the appropriate method for calculating fees, but under Bluetooth, it has to be done in such a manner as to achieve a reasonable result. As Mr. Pence will discuss, a 4.7 multiplier is not a reasonable result under the circumstances of this case. But the court's fee order in this case doesn't even mention the 4.7 multiplier at all, and our position is that's not consistent with the fiduciary obligations to the class. Are you saying that a Lodestar cross-check is required? I believe that's, I don't think that is the current state of the law. I do believe that a Lodestar cross-check should be required. In this case, there's no need. If it's not required, then how could it have abused the district judge's discretion to not mention the 4.7, which of course would be based on a Lodestar cross-check? Because this circuit has, in several cases, has said that there are special circumstances that require the court to look beyond the percentage and to consider the hours reasonably expended in the case, and that would be the Bluetooth opinion and Washington public power. And we have several circumstances, several red flags that should have called the court's attention to the Lodestar, particularly when it was right before we have a, it's the material before the court evidenced the 4.7 multiplier and the court failed to engage it. And those factors include the very brief nature of the litigation, no formal discovery, and a settlement that came directly on the heels of a lawsuit. It's our position that this case falls under the special circumstances exception in Washington public power and Bluetooth. It's not enough to say that fees are below the 25 percent benchmark as counsel have, so it must be a reasonable award. The Washington public power opinion rejected that same argument when the attorney said a 13 percent fee was reasonable because it was also under the benchmark. As a court said in Washington public power, there's a danger in selecting percentages in the abstract without reference to labor. And it should be noted that the 15 percent fee here came from class counsel. It wasn't something that the court arrived at through its own analysis. Let me address the official opinion cited by class counsel, which they suggest stands for the proposition that it's okay to disregard Lodestar on cross-check. To be clear, the court has never said it's free to, to, district courts are free to disregard a cross-check. And Fishel does not support that proposition. Fishel is class counsel complaining they didn't pay enough, they didn't get paid enough under the Lodestar method, not the percentage method. There's no concern as there is here that too much was being taken from the class in light of the actual labor of counsel. Let me lastly address the fact that the 4.7 multiplier shouldn't be watered down with future work that class counsel anticipated. The Supreme Court in Hensley discusses Lodestar as reasonable hours expended. It doesn't say hours that they are likely to expend. No circuit has held differently. And the Volkswagen case, which class counsel cite at federal, 746 Federal Appendix 655, jump site 659, from this circuit in 2018, class counsel cited it without noting, noting it's an unpublished, non-presidential opinion. And I'll reserve my time. Thank you. Thank you. Good morning, Your Honors. John Pence on behalf of Jill Piazza. The main problem with this case and the court's fee award is that class counsel did not create this benefit. What the district court here did was essentially reward class counsel for disarming the class. The class counsel was just as disarmed as class counsel was in Hyundai. And in fact, on page 48 of their brief, class counsel admit that being disarmed was a problem in Hyundai and tried to distinguish this case from that one on that basis. But there was no difference because class counsel had no chance of winning their appeal to this court. I think Lamps Plus shows that there was no opening anymore for arguing that the FAA is not, does not enforce arbitration agreements in all cases. Class counsel was simply the and put all of its problems behind it when it decided to settle with the City of Los Angeles and the Consumer Financial Protection Bureau. I think it's very clear, based on the timing of when these things occurred, that Wells Fargo used this case to distribute the compensation to the class members or their injured customers. And the fact, the increase, the arbitrary increase that happened from $110 million to $142 happened sua sponte, completely at Wells Fargo's discretion, when Wells Fargo discovered that they had left certain class members out and wanted to extend the class period to get a bigger release. Class counsel states on page 32 of their brief that the general is to be assessed at the time of the filing of the complaint. But it is also equally true that settlement eliminates risk. And that's been recognized by many courts. A case I submitted just this morning, to your honors, In re Tremont Securities from the Second Circuit, 699 Fed Appendix 8 from 2017, rejected a 3 percent fee and a multiplier of 2.5 for settlement administration work. I believe that involved devising a plan of allocation. But it's the same here as settlement administration work. And the fact that class counsel included in their lodestar 2,500 future hours that have not been occurred and may not be occurred, that are no risk. I mean, they're guaranteed to be paid. But they want those hours to also be multiplied by 3. So in other words, they anticipate 1.5 million of lodestar going forward. I guess I'm trying to understand. Am I missing something? You're talking about the lodestar and what was projected, I guess. But the lodestar wasn't used here. Well, the lodestar was in evidence. And as Mr. Klor argued. Sure, but didn't the district court ultimately do a The district court didn't arrive at 15 percent, your honor. The class counsel asked for 15 and the district court granted it. But that seems like what's in our case. As Washington Public Power Supply says, how do you pick any percentage without looking at the factors which include the lodestar and the quick settlement here? I don't dispute. He had to look at a lot of things, including everything that had been submitted across the board. I was just trying to figure out why you were pointing at that particular data point. But that's fine. I understand now. I just want to add, it's not just the Second Circuit that has observed that there's no risk after a case is settled. In the Hyundai panel decision, Judge Ikuta asked at page 581 of her dissent why a multiplier was applied to confirmatory discovery lodestar. And here, we're applying a multiplier of three to post-settlement time in the future. So the class counsel will be paid $4.5 million for $1.5 million of lodestar. If that is the new rule, then I think all California lawyers are going to start tripling their bills before they send them to their non-contingent clients. The post-settlement lodestar here is no different from the confirmatory discovery lodestar that Judge Ikuta questioned in Hyundai. Because this case settled so quickly after it was filed and was dismissed four months after it was filed based on the arbitration clause, something class counsel had to anticipate, it was in mediation for another year and then it settled. Certainly, the lodestar that was incurred prior to settlement should be increased by a multiplier. But everything after that really shouldn't, and that should lead to a much lower percentage. Thank you. Thank you, Your Honors. Good morning again, Your Honors. Derek Lozier for the settlement class. Again, I'd like to start very briefly with just what the settlement achieved. I understand that the objectors have a variety of things that they thought should have gone differently, but Judge Chabria did carefully review this settlement and did so rigorously. There are things about this settlement, a number of things, that are exceptional. This is a non-reversionary, $142 million settlement that makes class members more than whole. That's exceedingly rare in the world of class action settlements. It was something in the Volkswagen case where the court noted that the fact that was make whole relief. Well, this is make whole relief as well. I think it's also exceptional that all the risk of uncertainty is shifted to Wells Fargo here. This is something that's very rare in a class action settlement. We did not have, and nobody had perfect knowledge in this case about the number of unauthorized counts. That's just the nature of the Wells Fargo. It's simply not true that anyone's claims were diluted, that anything was diluted. It has an uncapped guarantee. So if our estimates of the class size were off, Wells Fargo has to put in more money. I think it's also worth noting that there's a very small number of objectors here. There were 29 total, only five of which have appealed. And that's not because the class didn't know about this settlement. There were over 200 million emails, email notices sent out to people, millions of direct mail notices. This was widely, widely noticed. The district court judge referred to it as robust and extensive notice, and there was a reason for that. We wanted to make sure that everybody who could potentially have been impacted learned about the settlement so they could submit a claim. And that, in fact, the claims themselves have been robust. As of the latest count, the deadline was back in July, 730,000 people have submitted claims in this case. This case has none of the red flags that this court has identified. Class counsel is not seeking a disproportionate amount of the common fund. There's no clear sailing provision on fees, and none of the settlement can revert to the defendants. This settlement took hard, devoted work of class counsel, and the result is, in fact, exceptional. And I want to go back to the standard here. It's an abuse of discretion standard. And Judge Chabria took that very, very seriously. He reviewed this settlement closely. This Court has said that when deciding whether a settlement is fair or deciding whether a settlement is fair is ultimately an amalgam of delicate balancing, gross approximation, and rough justice best left to the district judge, who has or can develop a firsthand grasp of the claims, the class, the evidence, and the course of the proceedings, the whole gestalt of the case. Here, Judge Chabria certainly demonstrated a firsthand grasp of the whole gestalt of the case. Anyone who has been before the district court judge on class settlements knows how careful he is to pay attention to every term. And he, in fact, had multiple hearings, both a preliminary hearing, a final hearing, and multiple status conferences in between, required extensive briefing, including written questions on before preliminary approval, and then throughout the process between preliminary and final approval hearings in which his questions could be addressed, in which objectors could be heard, in which he could evaluate whether the settlement was fair. Just I'll try and summarize quickly the argument. Some of the arguments that you've heard from the Why don't we focus, if you don't mind, at least initially on the ones that were made here today, and that's, I think, challenging the predominance because of the different state laws that may have applied here, and then the attorney's fees. Right. The predominance question, Your Honor, kind of hit the nail on the head. This case, the central feature of this case, the core claim is a federal claim. It's FCRA. That's the claim for which the most damages were incurred. It provided the potential for attorney's fees, and it was the most viable path to class certification. It's the center of the case. That's not the issue in Hyundai. Hyundai is a case involving a national class action based upon state laws. Now, the fact of the matter is the objectors relied on an opinion that was withdrawn, and in the on-bank decision, you know, everything about that decision is clearly applicable here as well. There's no trial manageability concerns here because there was a settlement. This is a consumer fraud case, and there was no, as counsel admitted, there was no conflict analysis at all. So the Hyundai on-bank decision clearly applies, but beyond that, it's a completely different circumstance. It's a federal claim. MAZA is not applicable here because we're dealing with a unifying federal cause of action. Is there any authority, though, that says that even when there's a federal claim, a district court's not required to conduct a choice of law analysis for state claims? Yeah. The question, it's not simply that there is a federal claim. It's that there is a federal claim that is the core feature of the case. So there's authority that one of the objectors cites the Nexus case, I believe, in which a choice of law analysis was necessary where there was a federal claim. But it was a Magnuson Moss warranty case in which the federal law was based upon state law. So there it was relevant to conduct state law analysis. It's just not relevant here. And for that reason, the objectors can't find support in the Hyundai dissent either because there the dissent was faulting the district court for not conducting a choice of law analysis among the 50 States. But again, that was a class that sought to certify a state law claims across 50 States. And that's just not what we have here. The federal claim in this case provides a path to certification, which, as Judge Chabria noted when he evaluated this exact issue, the state law claims that they point to have a host of class certification problems. In the Seventh Circuit, the Court, when addressing a similar argument that objectors made here about, you know, we did something wrong, we're not adequate because we didn't pursue State claims, the Court noted, why they should have an obligation to find some way to defeat class treatment is a mystery. It is best to bypass marginal theories if their presence would spoil the use of the aggregation device that on a whole is favorable to holders of small claims. Well, that's exactly the circumstance here. There's neither a predominance problem because we have a federal claim, nor is there an adequacy problem for not pursuing the State identity theft statutes because, frankly, they were not a good path to class-wide resolution. Why don't you move on to the attorney's fees before your time? So here, as the Court noted, the District Court has the option of choosing a lodestar method or a percentage method. Here, the District Court chose the percentage method, and it didn't willy-nilly just pick a fee and didn't do any analysis. The Court analyzed the Vizcano factors, applied them, and based upon the circumstances of the case, determined that the fee we sought was appropriate. That's exactly what this Court instructs the District Court to do. Nor is it the case that the Court wouldn't apply the benchmark. The fact of the matter is he applied a percentage that is 10 percent below the benchmark. The Court obviously took into account the circumstances of this case, including the size of the settlement. And when evaluating the fee, he noted the factors that support the fee, including reference to studies that indicated that the fee was below the median for settlements of this size. Counsel notes that the multiplier should not, or assert that the multiplier should not have included future work. There was 2,500 hours of future work. Can you please address that? Sure. I'll address that and also the notion that we're seeking a 4.7 multiplier, which is just frankly wrong. The lodestar information was all presented to the District Court at final approval, and as noted, he chose the percentage method, not the lodestar method, but he had all the information, which the Northern District Court requires anyway. And the lodestar is actually 3.06 at the time of final approval. Future hours is, it's routine to include future hours when a court is conducting a lodestar crosscheck. The purpose of a lodestar crosscheck, when it's performed, is to determine whether there's been a windfall. In order to determine whether there's a windfall, you obviously have to consider all of the hours that will be required by the case. That includes the extensive amount of work that needs to be done following preliminary or final approval itself. So we submitted an estimate. It was a reasonable estimate. The court evaluated that we submitted in our briefs what our estimate was. It was fully explained to the court. And, you know, it's, if you're going to do a lodestar crosscheck, you do need to consider all of the work in the case. In the Volkswagen case, this court considered the same and noted that the future hours were included and didn't have a problem with that. The fact of the matter is, the question is, was it a reasonable estimate? And here we proposed it would be 2,500 hours. We explained why. One of the reasons why that amount of time was necessary was designing and implementing the credit impact damage model, which requires working with Wells Fargo, the three credit reporting agencies, among others. The credit expert was extremely time-consuming, extremely important. We knew it was going to take a significant amount of time. The fact of the matter is, we told the court it was a conservative estimate, and it was. As of our last update to the court, we have actually billed over 3,900 hours. So we were 1,400 hours short. So if a lodestar crosscheck were to be done now to analyze whether there was a windfall, our lodestar multiplier now would be something that starts with a 2, not a 3. The windfall argument was wrong then, and it's even more wrong now. Did you want to leave five minutes for the Wells Fargo? Yes, thank you for reminding me. No, it's fine. You have four minutes and 45 seconds. Oh, I'm sorry. I'm sorry. I thought you should give me a second. I'm sorry. You have five more minutes. I'm sorry. I thought it was 20 minutes. Well, I guess I should use the rest of my time. If the court would prefer. I'm sorry. I thought it was my fault. Sorry. I just didn't want you to take all of your co-counsel's time there. I appreciate that, Your Honor. There were a couple other arguments that were made that I'll respond to briefly, Your Honors. The notion that the time spent after preliminary approval or final approval, for that matter, is somehow an important time, which has been likened to confirmatory discovery, which, frankly, can be important. Here, as we explained to the district court, the time that we needed to spend was exceedingly important to the resolution that occurred here. For one, there was ongoing, complex, difficult negotiations that went right up until final approval. And then the process of designing and implementing this credit damage model is extremely important for the settlement, extremely time-consuming, and results in something that we think is extraordinary. Every class member who checks the box on the claim form indicating that they have credit damage will then have an analysis of years of their credit history to figure out what impact on their credit score Wells Fargo's conduct had. And a but-for credit score is calculated, which is then applied to up to seven years of their borrowing before and after each of these unauthorized accounts to determine a dollar figure for that person that, for some people, will be thousands of dollars and, for some people, less, depending on how much they borrowed. That is an extraordinary feature of the settlement. It's innovative, as the district court noted. We're not aware of it ever being done before. And it's one of the reasons why the settlement is exceptional and the work that we did here is exceptional. And I think it'll serve as a model going forward in cases like this where there's been credit damage. On this question of dilution, I referred to that briefly. Mr. Christensen thought that somehow the change to the estimated size of the class would result in a dilution of recovery. It's just not true. We structured this settlement to take into account the fact that the actual number of unauthorized accounts is something that's hard to identify. And we shifted the risk to Wells Fargo so that our estimate, which initially was $3.5 million, if, in fact, there were many more claims than that with many more accounts, Wells Fargo would simply have to put in more money if all of the compensatory damage calculations used up the fund. We also prevented dilution of the $25 million reserve by having that reserve adjust. If, in fact, our estimates were low and there were more, the reserve would have to adjust precisely so there was no dilution. We also were very careful in structuring the settlement to prevent any situation where one class member's claim would reduce another class member's claim. And that, preventing any kind of zero-sum game that was apparent in the In Re Literary Works case from the Second Circuit, where you have different pools of claims and some can take money from others harming people. That cannot happen under this settlement. As far as the different – there are different pools that have to do with the time periods that were referenced. The initial settlement was $110 million. When, based on information that was – became public, it became clear that Wells Fargo's conduct started earlier. We created a second pool. We protected the recovery for the first pool. We negotiated for the second pool. There's no possibility that there's any dilution. And that was designed specifically to structure the settlement to prevent exactly the kind of argument that objectors are making here. As to the arbitration clause issue, Judge Chabria noted in his final approval order and in his preliminary approval order that arbitration clause presented primarily a class certification risk. And he noted in hearings when these objections were made and in his orders that he didn't think that Wells Fargo – he didn't think it likely that they would be able to prevail on their class arbitration argument or their arbitration clause argument anyway. So it's simply not true to say that somehow the Court found that the arbitration clause was the reason why this was a good settlement. That is not what the Court did. He recognized the possibility that we would get over the arbitration clause. And frankly, the results show that in negotiating the settlement, the arbitration clause did not prevent us from achieving outstanding results for the class. Thank you. Thank you. And I apologize for the time mix-up. All right. May it please the Court, Ben Horwich on behalf of the Wells Fargo appellees. Judge McGee, I might try to answer your question about is there authority with respect to choice of law when there's a Federal claim. And I don't know of a case, but the reason it wouldn't exist is because of course Federal law we know for certain applies to everyone. So it's not a situation as in Hyundai where you might have a question, well, does California law apply or does Virginia law apply? And it's an either-or. So the real question from the point of view of these State law claims is what do they add by asserting them? And as Mr. Lozier pointed out, it can be a mystery why you would assert claims that would tend to defeat class certification as opposed to improve it. But there's actually a very practical point here, which Judge Chavria recognized, which is that you're not going to see more recovery under a law that provides, relative to a law like FCRA, where there's already in the settlement compensatory damages, there's already a non-compensatory component, there's a non-monetary kind of remedial efforts in the settlement. And so the question is why would you go trying to add other State law claims on top? Like what's the practical way forward for the class doing that? And there's not been an answer to that. Judge Chavria didn't hear an answer from the objectors on that. And in this Court, they haven't offered that. And I think that's actually emblematic of all of the objections here, and Judge Chavria recognized this repeatedly, is that there are objections, but they don't actually point to a different or better way forward for the class or point to something that would change what you would see in this settlement. And so I'd encourage the Court to look at Judge Chavria's questions in that regard of the objectors of preliminary approval. He has some very emphatic statements in the final approval hearing about, well, I hear your objection, but what are we supposed to do that's different about this? So let me ask you about something different. Thank you for following up on that. But I think we recently granted the objectors' request for judicial notice of consent order showing that certain Wells Fargo executives had to pay several million, I think it was $58 million, in civil penalties. Objectors claim that this shows that the $152 million settlement was too low. I guess I wanted to hear from you to see what your thoughts and whether those penalties are relevant to our analysis here. Thank you, Your Honor. It's a good question. So I would say a couple things about those documents. The first thing is that in terms of the facts in those documents, that some of them are charges, some of them are settlements, what's really notable about them is how similar they are to the facts that were on the table in the fall of 2016 and the spring of 2017 through the OCC's consent order with the bank, through the CFPB's consent order with the bank, through the report of the independent directors. And so all of the facts that were on the table then, and all of those things I just mentioned happened before plaintiffs even moved for preliminary approval, are essentially reiterated in these documents. So in some sense, I think it actually tells us that the settlement was negotiated in light of all the information that would be relevant to it. So in some ways, I think it confirms the point that the settlement is sort of soundly negotiated. With respect to the size of the penalties, something the court should, I think, be cognizant of is that there are a number of different ways that these bad events have harmed different people in different ways. And we're here talking about just one piece of that, which is the people in whose names unauthorized accounts were opened. But obviously these events pose larger issues. So one of those, and in particular the concern of the OCC, is bank safety and soundness. So the OCC is concerned not just with individual customers of the bank, such as the members of the class here, but with anyone who does business with the bank, and the soundness of the bank's operations. And in fact, the general national confidence in the banking system and the safe and sound practices of the bank, and all of us as taxpayers who are responsible for deposit insurance, for example. So the OCC is operating under other laws that have other considerations. And so what the OCC has done is part of the picture here. This class settlement is part of the picture. What the Consumer Financial Protection Bureau did in the fall of 2016 is part of that picture. There are references to securities actions. There are references to the bank clawing back compensation. There's a number of pieces of it. And so I think this court should recognize that each of those pieces has a role to play. This settlement is a very important piece of that, but it's not the only thing. And so I think the court should look at it kind of cumulatively in that way. Does that help, Your Honor, with that topic? Yes, I wanted to hear from you regarding the relevancy of that. Okay. I see my time has expired. If the court has other questions, I'm happy to answer them. Let me just ask if Judge Gould has any questions. No questions. Thank you. Thank you, Your Honor. So we'll begin our rebuttal round. Your Honor, we ask for judicial notice of the $58 million because we think it is entirely appropriate for the court to consider the balance between what a handful of bank employees were fined by the federal government with regard to this behavior and what a $1.3 trillion company is paying for the same behavior to the class members. I mean, triple $58 million in your past what's being paid by a whole lot. This is a case that was driven by the arbitration clause. It was settled at 5% of the $2.4 billion worth of value that this case had to the class members under the federal law. I'm not looking at state law whatsoever. The settlement runs into an RTSB fireboard issue, which I was trying to point out earlier. That is that the named plaintiffs in this case have contractual relationships with Wells Fargo, and to the extent that the arbitration issue is relevant to the settlement, they're certainly the people who have an arbitration agreement with Wells Fargo. Thank you. My client, Mr. Christensen's client, they do not have this relationship. They belong to a subclass of people who do not have a contractual relationship with Wells Fargo. Therefore, their interests are entirely different and separate and more valuable than class counsel's clients who have to deal with the arbitration issue. It's one thing for the judge to say he's not sure whether or not in the long run arbitration is going to drive the cart. It's another thing for the judge to let the case go to you all in the Ninth Circuit on the issue of whether arbitration is going to prevent a class action, and then while it sits here without being briefed and anything happening, the case settles for a tiny percentage of the potential damages. Thank you. Thank you, Your Honor. Thank you. In response to a previous question, the Hyundai en banc decision provides a good analysis of when a choice of law is required on pages 562 to 563, and Mr. Garrison, an attorney from, I believe, Alabama, provided this choice of law analysis in this case on the May 18th hearing, 2017, page 14 through 29 of the transcript. The benefit of these state law claims is they are $10,000 in some states. Under FCRA, we have $100 to $1,000, which if we do the math would be $350 million to $3.5 billion for an admitted wrongdoing by Wells Fargo, and they're paying more money to the stockholders by two and a half times than they are to the victims that they exploited. Further, there was no notice in this case, which is a constitutional requirement to my client's children, and we would just request that this go back to the be remanded to the district court to prevent a company that's too big to avail to from trampling over those who are too small to fight. Thank you, Your Honors. Thank you. Your Honors, this court recognizes that a district court abuses its discretion if it fails to address meritorious objections. The objection that a 4.7 multiplier is excessive should have been addressed, and the court's fee order, but it was not. The court didn't offer any explanation why it declined to look at that. Can you then respond? Because the counsel over here, your colleague across the aisle here, said it wasn't a 4.7. It was a 3 point. I can't remember exactly, but do you not acknowledge that? That's incorrect. That assumes that you include all future hours. I see. Okay. I get it. With all future hours, it's a 4.7 multiplier, and the numbers are spelled out in our briefs. No circuit has said you can include future hours to form Lodestar. This court hasn't, and it shouldn't. Thank you, Your Honors. We ask that the court reverse, vacate the order awarding $21 million in fees. Thank you. Thank you very much. Thank you. I guess that concludes the oral argument presentations. Thank you all very much. The case of Shirar Jabari v. Wells Fargo v. Chad Michael Farmer et al. is now submitted, and that concludes our docket for this morning. Thank you all very much.
judges: Gould, Murguia, Feinerman